# UNITED STATES DISTRICT COURT

for the

Eastern District of California

**FILED**

May 10, 2022

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

**SEALED**

|  |  |
|---|---|
| In the Matter of the Search of ⟩ | |
| ⟩ | |
| Red 2010 Nissan Altima, bearing personalized CA ⟩ | Case No.    2:22-sw-0330 DB |
| license plate number BOBEEJO, VIN ⟩ | |
| 1N4AL2EP4AC173331 ⟩ | |
| ⟩ | |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

**SEE ATTACHMENT A-14, attached hereto and incorporated by reference.**

located in the _____Eastern_____ District of _____California_____ , there is now concealed *(identify the person or describe the property to be seized):*

**SEE ATTACHMENT B, attached hereto and incorporated by reference**

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. § 841(a) and 846; | Conspiracy to distribute and possess with intent to distribute controlled and/or counterfeit substances, including counterfeit opioid pills containing fentanyl, and cocaine; |
| 21 U.S.C. § 841(a); | Distribution and possession with intent to distribute controlled and/or counterfeit substances, including counterfeit opioid pills containing fentanyl, and cocaine; |
| 18 U.S.C. § 371; | Conspiracy to Unlawfully Deal in Firearms Without a License; |
| 18 U.S.C. § 922(a)(1)(A) | Unlawful Importing, Manufacturing, or Dealing in Firearms |

The application is based on these facts:

**SEE AFFIDAVIT, attached hereto and incorporated by reference.**

- ☑ Continued on the attached sheet.
- ☐ Delayed notice _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/Matthew Clayton

*Applicant's signature*

Matthew Clayton, DEA Special Agent

*Printed name and title*

Sworn to me and signed telephonically.

Date:       May 10, 2022

City and state:       Sacramento, California

DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

## AFFIDAVIT OF DEA SPECIAL AGENT MATTHEW CLAYTON IN SUPPORT OF SEARCH WARRANTS

1. I, Drug Enforcement Administration ("DEA") Special Agent Matthew Clayton, being duly sworn, hereby state:

### SCOPE OF REQUESTED SEARCH WARRANTS

2. This affidavit supports an application for warrants to search the locations, vehicles, and persons further described below and in **Attachments A-1 through A-14**. The contraband, objects, and information for which we will search are described in **Attachment B**. Attachments A-1 through A-14 and Attachment B are incorporated by reference.

3. We request authority to search the following locations for the items described in **Attachment B**:

   i. **3059 8ᵗʰ Avenue, Unit A, Sacramento, California 95817** (Residence of Sukhmanpreet Singh JAWANDA), more fully described in **Attachment A-1**;

   ii. **7642 Redhill Way, Browns Valley, California 95918** (Residence of Sukhmanpreet Singh JAWANDA), more fully described in **Attachment A-2**;

   iii. **1200 B Street, Apt 3, Yuba City, California 95991** (Residence of Sukhmanpreet Singh JAWANDA), more fully described in **Attachment A-3**;

   iv. **Farmers Insurance, 990 Klamath Lane, Suite D-19, Yuba City, California 95993** (Employer of Robert "Bobbie" Jo VANN), more fully described in **Attachment A-4**;

   v. **1628 Buena Vista Drive, Yuba City, CA 95993** (Residence of Robert "Bobbie" Jo VANN), more fully described in **Attachment A-5**;

   vi. **916 Blue Street, Apt 8, Marysville, California 95901** (Residence of Lonnie Brice VANN), more fully described in **Attachment A-6**;

   vii. **AA Self Storage, 1788 Lassen Blvd, Units G92 & 1-2, Yuba City, California 95993** (Storage Units of Robert "Bobbie" Jo VANN), more fully described in **Attachment A-7**;

   viii. **Sukhmanpreet Singh JAWANDA**, more fully described in **Attachment A-8**;

   ix. **Robert "Bobbie" Jo VANN**, more fully described in **Attachment A-9**;

   x. **Lonnie Brice VANN**, more fully described in **Attachment A-10**;

   xi. **Black 2021 GMC Sierra C049J1** (Vehicle of Sukhmanpreet Singh JAWANDA), more fully described in **Attachment A-11**;

   xii. **Black/Red 2021 Dodge Charger 8XIW871** (Vehicle of Robert "Bobbie" Jo VANN), more fully described in **Attachment A-12**;

1

xiii.   **Grey 2021 Dodge Durango 8YGP548** (Vehicle of Sukhmanpreet Singh
JAWANDA), more fully described in **Attachment A-13**; and

xiv.   **Red 2010 Nissan Altima BOBEEJO** (Vehicle of Robert "Bobbie" Jo VANN),
more fully described in **Attachment A-14**.

## BACKGROUND AND EXPERTISE

4.   I am a Special Agent of the United States Department of Justice, Drug Enforcement
Administration (the "DEA").  I have been a DEA Special Agent since September 2004.  I
am currently assigned to the DEA Sacramento District Office ("SDO") charged with
investigating major drug trafficking organizations operating in the Eastern District of
California.  I am an "investigative or law enforcement officer" of the United States within
the meaning of Title 18, United States Code, Section 2510(7), in that I am an officer of
the United States empowered by law to conduct criminal investigations and make arrests
for offenses enumerated in Title 18, United States Code, Section 2516.

5.   I was trained as a DEA Special Agent at the DEA/FBI Academy, Quantico, Virginia.
During my training, I received special training in the Controlled Substances Act, Title 21
United States Code, including, but not limited to, Sections 841 and 846, Controlled
Substance Violations and Conspiracy to Commit Controlled Substance Violations,
respectively.  I have received special training regarding criminal organizations engaged in
conspiracies to manufacture and/or possess with intent to distribute fentanyl, counterfeit
pharmaceutical tablets, ecstasy/MDMA, methamphetamine, cocaine, cocaine base,
heroin, marijuana, and other dangerous drugs prohibited by law.  I received further
training in search and seizure law and many other facets of drug law enforcement
including clandestine laboratory investigations.

6.   As a DEA agent, I have assisted in the execution of search warrants on many occasions
for controlled substances and/or related paraphernalia, indicia, and other evidence of
violations of federal drug statutes.  I have participated in multiple investigations targeting
individuals and organizations trafficking fentanyl, counterfeit pharmaceutical tablets,
ecstasy/MDMA, cocaine, heroin, marijuana, methamphetamine and other drugs.  During
the course of these investigations, I have become familiar with the manner in which drug
traffickers use telephones, often cellular telephones, to conduct their illegal operations.  I
have participated in wire interception cases encompassing multiple telephones and have
previously written wire interception affidavits.  Furthermore, I have served as both a
monitor and wire room supervisor on federal wiretap investigations.  Additionally, I have
attended the California Department of Justice's eight-hour wire interception certification
course, as set out in California Penal Code § 629.94.

7.   Through my training, experience, and interaction with other experienced Special Agents, Task Force Agents, and other drug investigators, I have become familiar with the methods employed by drug traffickers to smuggle, safeguard, store, transport, and distribute drugs, to collect and conceal drug related proceeds, and to communicate with other participants to accomplish such objectives.  These methods include the use of telephones, pre-paid or debit calling cards, public telephones, wireless communications technology such as paging devices and cellular telephones, counter-surveillance, elaborately planned smuggling schemes tied to legitimate businesses, and use of codes in communications in an attempt to avoid detection by law enforcement.  Based on my training and experience, I also know that violators of the controlled substances laws often purchase telephones or subscribe to telephone service using false names and/or other individuals' names to avoid detection by law enforcement.

8.   During the course of this investigation, I also consulted with Bureau of Alcohol, Tobacco, & Firearms ("ATF") Task Force Officer ("TFO") Tim Keeney.  TFO Keeney has been a TFO since 2017.  He is currently employed as a TFO and a Yolo County District Attorney Investigator.  Previously, beginning in 2002, he was employed by the Woodland Police Department.

9.   TFO Keeney attended the Sacramento Police Department Academy in 2002, where he received over 1,000 hours of law enforcement training in the investigation of crimes against persons and property.  Since the academy, TFO Keeney has continued to attend advanced officer training courses on various topics, including: Interview and Interrogation, ATF Privately Made Firearms Training, Firearms Technology and Specialist Training (International Firearms Specialist Academy), CAL DOJ Bureau of Firearms Assault Weapons Training, Health and Safety Code Section 11550 Evaluation Course, Informant Development and Maintenance, Electronic Surveillance (Penal Code Section 629.50), Prison Gang and Parolee Contacts, Search Warrants from A to Z, the Robert Presley Institute of Criminal Investigation Major Drug Investigations Course, and the Robert Presley Institute of Criminal Investigation Gang Investigations Course.

10.  TFO Keeney has also spoken with other experienced police officers and investigators in informal and formal training settings about criminal investigations.  He has participated in hundreds of investigations regarding crimes against persons and property.  TFO Keeney has interviewed suspects, victims, witnesses, and confidential informants.  He has also participated in firearm and narcotics investigations and has conducted physical surveillance of firearm and narcotic transactions and dealers.  During and after these surveillances, TFO Keeney has discussed the techniques used by suspects with experienced officers.

11. TFO Keeney has conducted undercover purchases of firearms, confidential informant buy/walks, and confidential informant buy/bust operations related to the sales and/or transportation of firearms and controlled substances. He has participated in numerous probation and parole searches of residences and vehicles regarding firearm and drug investigations, and has participated in executing over 20 search warrants of residences, vehicles, and persons for narcotics, firearms, and other investigations.

12. In addition to my personal knowledge, this affidavit is based on (1) information I obtained from related investigations; (2) conversations with other law enforcement officers including oral and written investigative and laboratory reports that I received directly or indirectly from other law enforcement officials; (3) review and analysis of information received from various sources, including evidence provided pursuant to subpoenas and search warrants, such as GPS tracking data; (4) physical surveillance conducted by law enforcement officials reported to me either directly or indirectly; (5) a review of public records, telephone toll records, and subscriber information; (6) information provided from confidential sources of information, cooperating defendants, and other sources of information working with law enforcement agencies; (7) a review of driver's license and automobile registration records; (8) records from various law enforcement databases, including but not limited to the National Law Enforcement Telecommunications System ("NLETS") and the National Crime Information Center ("NCIC"); (9) my training and experience as a DEA agent; and/or (10) the training and experience of other law enforcement officials with whom I consulted during this investigation and the preparation of this Affidavit.

13. Because this affidavit is submitted for the limited purpose of supporting the requested search warrants, I have not included the details of every aspect of the investigation. I have set forth only the facts that I believe are necessary to establish a foundation for an order authorizing the search and seizure of the property identified in this affidavit.

## STATEMENT OF PROBABLE CAUSE

A. *__On November 10, 2021, an undercover officer purchased approximately 1,000 counterfeit oxycodone blue "M30" pills containing fentanyl from Sukhmanpreet "Manny" Singh JAWANDA.__*

14. In November 2021, an undercover officer (the UC) purchased approximately 1,000 counterfeit oxycodone blue "M30" pills for $3,000 from Sukhmanpreet "Manny" Singh JAWANDA in Yuba City, CA, as further detailed below; this controlled purchase was negotiated via Snapchat communications between JAWANDA and the UC.

15.    On November 8, 2021, the UC sent a message to JAWANDA at Snapchat account
       "manny5.30" (JAWANDA ACCOUNT-1) which stated, "I should have the money by
       wed bro. U gonna b good for that (boat emoji)."  Based on my training and experience, I
       know that the term "boat" (represented here by an emoji of a boat) is often used as code
       for a quantity of 1,000 pills; in this message the UC was asking if JAWANDA could
       supply the UC with 1,000 pills.

16.    On November 9, 2021, JAWANDA sent the UC a Snapchat message from JAWANDA
       ACCOUNT-1 which stated, "Was good" and "You need that," which the UC responded
       to by stating, "Yup I got the 3 bands for u. Can u do tomorrow before like 1."  Based on
       my training and experience, I know that the term "band" is often used as code for a
       quantity of $1,000; in this message the UC was notifying JAWANDA that the UC had
       $3,000 ("3 bands") to purchase pills.

17.    On November 10, 2021, at approximately 11:24 AM, the UC sent a Snapchat message to
       JAWANDA ACCOUNT-1 which stated in part, "Can u meet at the shell on 99."  At
       approximately 11:55 AM, another Snapchat message thread concluded between the UC
       and JAWANDA ACCOUNT-1 wherein JAWANDA asked, "Wya," and then stated, "I
       can meet you at shell," and then asked, "How far you out."  The UC then responded, "Fs
       im omw from natomas rn."  JAWANDA then stated, "Yup lmk when your eta," to which
       the UC responded, "20 min bro."  JAWANDA then sent addresses for two (2) Shell gas
       stations and stated the following, "501 Fifth St, Marysville, CA 959…," "Yup perfect,"
       "1281 Obanion Rd, Yuba City, CA 959…," "This one rufht," and "Right."

18.    At approximately 12:33 PM, the UC met with JAWANDA during a controlled purchase
       operation at the Shell gas station located at 1281 Obanion Road, Yuba City, CA, where
       the UC purchased approximately 1,000 counterfeit oxycodone blue "M30" pills for
       $3,000 in official government funds from JAWANDA, whom surveillance observed
       arrive in a black 2021 GMC Sierra, bearing CA license plate number C049J1, registered
       to Sukhmanpreet Singh JAWANDA, 1200 B Street, Apt. 3, Yuba City, CA 95991
       (hereafter referred to as JAWANDA VEHICLE-1).[1]  During this controlled purchase
       operation, the UC exited the UC vehicle and walked up to JAWANDA who remained
       seated in the driver's seat of JAWANDA VEHICLE-1.  The UC then exchanged $3,000
       in official government funds for approximately 1,000 counterfeit oxycodone blue "M30"

---

[1] In a previous search warrant issued on December 16, 2021 (2:21-SW-0939-DB) for Snapchat account
manny5.30, the affidavit stated that at the time of the controlled buy on November 10, 2021, JAWANDA
VEHICLE-1 displayed CA license plate number 68101G3.  I later learned that JAWANDA VEHICLE-1
had transitioned to personalized CA license plate number C049J1 prior to the controlled purchase operation
on November 10, 2021.  Both plate numbers are associated with JAWANDA VEHICLE-1 and are
registered to JAWANDA's 1200 B. Street, Apt. 3, Yuba City, CA 95991 address.

pills from JAWANDA.  The pills were later submitted to a DEA laboratory for analysis, which determined the total quantity of pills to be approximately 967, with a net weight of approximately 102.3 grams, which contained fentanyl, caffeine, and acetaminophen.

**B.** **_On January 11, 2022, the UC purchased a Glock 43 9mm semi-automatic handgun from JAWANDA which was supplied by Robert "Bobbie" Jo VANN._**

19.   During a concurrent joint investigation with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF), Lonnie Brice VANN (hereafter referred to as L.VANN) was identified through social media as a firearms trafficker in the Sacramento Valley area. Additionally, L.VANN was positively identified by the UC as a passenger in a vehicle driven by JAWANDA who was present during the controlled purchase of approximately 20 counterfeit oxycodone blue "M30" pills (which field tested presumptive positive for fentanyl) from JAWANDA in Marysville, CA on October 27, 2021.

20.   On January 11, 2022, the UC purchased a semi-automatic handgun for $1,000 from JAWANDA in Yuba City, CA during a controlled purchase operation, as further described below; the gun was supplied to JAWANDA by Robert "Bobbie" Jo VANN (hereafter referred to as R.VANN), the parent of L.VANN.[2]

21.   At approximately 12:16 PM, surveillance observed JAWANDA driving a black/red 2021 Dodge Charger, bearing CA license plate number 8XIW871, registered to Bobbie Jo VANN, 6625 Rancho Pico Way, Sacramento, CA 95828 (hereafter referred to as R.VANN VEHICLE-1); a California state authorized tracking device had previously been installed on R.VANN VEHICLE-1 which surveillance was tracking simultaneously. At this time, surveillance observed R.VANN VEHICLE-1 turn northbound onto Klamath Lane from Lassen Boulevard in Yuba City, CA.

22.   At approximately 12:17 PM, surveillance observed R.VANN VEHICLE-1 arrive and park in front of the Farmers Insurance storefront located at 990 Klamath Lane, Suite D-19, Yuba City, CA; surveillance further observed that R.VANN VEHICLE-1 had parked one spot to the east of a red Nissan Altima, bearing CA license plate number BOBEEJO, registered to Bobbie J. VANN, or Donald G. Wiederspan, 6625 Rancho Pico Way, Sacramento, CA 95828 (hereafter referred to as R.VANN VEHICLE-2).  Surveillance then observed JAWANDA exit R.VANN VEHICLE-1 and enter the Farmers Insurance

---

[2] Based upon a commercial database query, it was determined that Bobbie Jo VANN was previously known as Robert Jo VANN, with matching dates of birth and social security numbers.  A CA DMV check revealed that Bobbie Jo VANN is the legal name that is currently listed on this individual's driver license.  It is unknown when this individual's legal name was changed, and for this reason the individual is being referred to as Robert "Bobbie" Jo VANN in this affidavit, as it is possible that potential evidence in this investigation may be linked to either or both names.

business.  It should be noted that a few days prior to this operation, the UC messaged JAWANDA on JAWANDA ACCOUNT-2 and told JAWANDA that the UC was looking to purchase ghost guns, and JAWANDA responded that JAWANDA would have a Glock 17 ready for the UC in a few days and would let the UC know.). Following JAWANDA's arrival at Farmers Insurance, JAWANDA messaged the UC from JAWANDA ACCOUNT-2 and told the UC that the Glock 17 was not ready yet, but JAWANDA had a Glock 43 for sale.  Surveillance observed that JAWANDA was inside Farmers Insurance when JAWANDA sent this message to the UC.

23.  At approximately 12:48 PM, the UC received photos from JAWANDA, utilizing Snapchat account "manny_jaw" (hereafter referred to as JAWANDA ACCOUNT-2); the photos depicted what appeared to be a Glock 43 style handgun with a gold-colored magazine extension, which are provided below.

 

24.  Following these photos, JAWANDA informed the UC via Snapchat that JAWANDA had a Glock 43 for sale.  The UC then asked via Snapchat what the price was for the firearm, and JAWANDA responded $1,150.  During the subsequent conversation via Snapchat, the UC was able to negotiate the price down to $1,000.

25.  At approximately 1:12 PM, surveillance observed JAWANDA exit the Farmers Insurance business in tandem with a white female adult whom surveillance positively identified as R.VANN.  Surveillance then observed JAWANDA and R.VANN walk to the trunk of R.VANN VEHICLE-2, where R.VANN opened the trunk of R.VANN VEHICLE-2 and provided an unknown item to JAWANDA, which JAWANDA quickly placed in his (JAWANDA's) front right jacket or pants pocket.  Surveillance then

7

observed R.VANN walk back inside the Farmers Insurance business, while JAWANDA departed driving R.VANN VEHICLE-1.

26.     At approximately 1:33 PM, surveillance observed JAWANDA arrive driving R.VANN VEHICLE-1 at an apartment complex located at 916 Blue Street, Marysville, CA; surveillance had previously observed JAWANDA at this apartment complex with L.VANN, the son of R.VANN.  While JAWANDA was traveling to the apartment complex, JAWANDA informed the UC via Snapchat that JAWANDA would sell the handgun to the UC in the parking lot of the Jack in the Box restaurant located at 1030 Tharp Road, Yuba City, CA later that day.  After JAWANDA parked R.VANN VEHICLE-1 at the apartment complex, surveillance observed JAWANDA exit R.VANN VEHICLE-1 and walk into the breezeway for apartments 5,6,7, and 8.  Surveillance then observed JAWANDA walk upstairs and turn towards apartment number 8, but surveillance was unable to observe whether or not JAWANDA entered apartment 8 (the known residence of L.VANN, as described further below).

27.     At approximately 1:38 PM, surveillance observed L.VANN and JAWANDA walk out of the 916 Blue Street apartment complex towards R.VANN VEHICLE-1, but surveillance was unable to observe if both individuals got into R.VANN VEHICLE-1.  Surveillance then monitored authorized tracking data for R.VANN VEHICLE-1 as it traveled away from the apartment complex towards the Jack in the Box meeting location.  On the way to the meet location, JAWANDA video called the UC via Snapchat to inform the UC that JAWANDA also had suppressors for sale and asked if the UC was interested.  The UC responded that the video was choppy so the UC would take a look when JAWANDA arrived at the meet location.  JAWANDA then told the UC over Snapchat message that JAWANDA was selling the suppressors for $100 each and had just picked them up, and that JAWANDA was only a couple minutes away from the meet location.  According to authorized tracking data, R.VANN VEHICLE-1 then traveled once again to the same Farmers Insurance business parking lot, where it stopped for approximately a minute, but surveillance was unable to observe if JAWANDA met with or dropped anyone off.  Immediately thereafter, authorized tracking data revealed that R.VANN VEHICLE-1 began traveling away from Farmers Insurance towards the Jack in the Box meet location where the UC was waiting.

28.     At approximately 2:05 PM, JAWANDA parked R.VANN VEHICLE-1 next to the UC's vehicle in the Jack in the Box parking lot located at 1030 Tharp Road, Yuba City, CA.  Immediately thereafter, the UC exited the UC's vehicle and got into R.VANN VEHICLE-1 with JAWANDA, who was the sole occupant of the vehicle.  JAWANDA then removed a polymer 80 semi-automatic Glock 43 style handgun with a gold-colored magazine extension (matching the firearm in the photograph JAWANDA had sent the

UC earlier that day via Snapchat) from his (JAWANDA's) waistband.  JAWANDA
manipulated the handgun to show the UC that it was operable, but JAWANDA stated that
he (JAWANDA) had not test fired it yet.  JAWANDA further stated that the handgun
was recently made.  JAWANDA handed the handgun to the UC, which had a threaded
barrel, along with an attachment on the barrel, which JAWANDA stated acted as a
suppressor.  The UC provided JAWANDA with $1,000 in official government funds in
exchange for the handgun.  JAWANDA told the UC that if the UC did not like the gold
magazine extension that "she" could order the UC a black magazine to swap out for the
gold magazine.  The UC asked JAWANDA, "It's a she that's making them?"
JAWANDA responded that it was JAWANDA's "step-mom" that makes them (in
reference to the firearms).  The UC asked JAWANDA if she was making a lot of
handguns and JAWANDA responded that he (JAWANDA) was getting some made for
someone right now.  The UC asked JAWANDA if his (JAWANDA's) "step-mom" lived
in town and JAWANDA said she worked across the street from the deal location (Jack in
the Box) next to the Tractor Supply (990 Klamath Lane; where surveillance had observed
JAWANDA meet with R.VANN).  JAWANDA told the UC that his (JAWANDA's)
"step-mom" had an FFL (Federal Firearms License) to manufacture firearms; however,
on May 3, 2022, ATF confirmed that R.VANN did not possess an FFL.  JAWANDA
advised the UC that if the UC had any issues with the handgun then JAWANDA could
take it to his (JAWANDA's) "step-mom" to fix it.  JAWANDA then opened the center
console of R.VANN VEHICLE-1 and removed a suppressor, which JAWANDA handed
to the UC.  The UC then attached the suppressor onto the threaded barrel of the handgun.
The UC asked for the price of the suppressor and JAWANDA responded, "$750."
JAWANDA stated that his (JAWANDA's) "step-mom" had a few suppressors left but
could not get any more at the moment.  The UC asked if JAWANDA's "step-mom" had
Glock converter switches, and JAWANDA responded that she did not have any at the
moment, but she typically charged $280–$300 for them.  The UC asked JAWANDA
what was up with the "17" that JAWANDA was supposed to sell to the UC, referring to
the Glock 17 that the UC had inquired about earlier with JAWANDA.  JAWANDA then
retrieved his (JAWANDA's) Apple iPhone and showed the UC a text message
conversation between JAWANDA and an individual that JAWANDA had saved under
the contact name "Lonnie" (believed to be L.VANN).  JAWANDA then showed the UC
a photograph that "Lonnie" had sent JAWANDA of the "17" and said that it was almost
done.  JAWANDA advised that he (JAWANDA) would notify the UC when the "17"
was done.  The UC then exited R.VANN VEHICLE-1 and got back into the UC's
vehicle.  JAWANDA then departed the Jack in the Box parking lot driving R.VANN
VEHICLE-1, traveling back towards the Farmers Insurance business.  According to
authorized tracking data, R.VANN VEHICLE-1 returned to the Farmers Insurance
business, but physical surveillance was terminated. Based upon ATF TFO Keeney's
training and experience in regards to illegal firearms trafficking, it is common for the

9

broker (JAWANDA) to pay the manufacturer (R.VANN) after the transaction is completed; the broker usually upcharges the buyer in order to make money off the transaction and receives the item(s) on a "front" or without paying for the item(s) from the manufacturer on the promise they will be paid for with proceeds after the transaction is completed.

29.   ATF Task Force Officer (TFO) Tim Keeney inspected the firearm purchased by the UC from JAWANDA and noted that it was a Privately Made Firearm (PMF) with no serial numbers or manufacturer markings.  The pistol was modeled after a "Glock 43" style firearm and was outfitted with a threaded barrel.  This configuration met the criteria for a violation of California Penal Code 30515(a)(4) – possession of an assault pistol.

### C. *On January 27, 2022, the UC purchased a Glock style full-automatic handgun and an AR-10 style semi-automatic rifle from JAWANDA.*

30.   On January 27, 2022, the UC purchased two privately manufactured firearms (PMFs), described as a (1) Glock style full-automatic handgun, and an (2) AR-10 style semi-automatic rifle, from JAWANDA for $2,100 official government funds during a controlled purchase operation which occurred in an A&W restaurant parking lot located at 2920 Del Paso Road, Sacramento, CA.

31.   According to authorized tracking data for JAWANDA VEHICLE-1, prior to the buy, JAWANDA departed his residence at 3059 8th Avenue, Sacramento, CA and went directly to the previously determined buy location at 2920 Del Paso Road, Sacramento, CA.  After JAWANDA arrived, the UC met with JAWANDA at the driver's side window of JAWANDA VEHICLE-1.  At JAWANDA's direction, the UC then opened the rear driver side passenger door of JAWANDA VEHICLE-1 and entered the backseat to inspect the rifle.  The UC then placed the rifle into the trunk of the UC's vehicle, which was parked directly next to the driver's side of JAWANDA VEHICLE-1.  The UC then re-approached the driver's side window of JAWANDA VEHICLE-1, where JAWANDA removed the Glock style handgun from his (JAWANDA's) waistband and handed it to the UC.  The UC then purchased the weapons from JAWANDA by providing $2,100 official government funds to JAWANDA.  Following this transaction between JAWANDA and the UC, authorized tracking data for JAWANDA VEHICLE-1 revealed that it traveled to 990 Klamath Lane, Yuba City, CA (where R.VANN works at Farmers Insurance) and stopped there for approximately 15 minutes.  Based upon ATF TFO Keeney's training and experience in regards to illegal firearms trafficking, it is common for the broker (JAWANDA) to pay the manufacturer (R.VANN) after the transaction is completed; the broker usually upcharges the buyer in order to make money off the transaction and receives the item(s) on a "front" or without paying for the item(s) from

10

the manufacturer on the promise they will be paid for with proceeds after the transaction is completed.

32.   On the same date, ATF TFO Keeney inspected the firearms that were purchased by the UC from JAWANDA and noted that the AR-10 style rifle was equipped with a 20 round magazine, while the Glock style handgun was equipped with a 10 round magazine, and that neither the lower receiver on the rifle nor the receiver on the handgun had serial numbers or manufacturer markings.  ATF TFO Keeney conducted a function check of the AR-10 style rifle but could not determine if it functioned as a machine gun.  ATF TFO Keeney conducted a National Integrated Ballistic Information Network (NIBIN) test fire of the Glock style handgun and determined that it functioned as a machine gun even though it contained no parts that outwardly revealed it to be a machine gun.  Both firearms were sent to the ATF Firearms Technology Branch for a determination of function.  On February 4, 2022, the ATF Firearms Technology Branch confirmed that the Glock style handgun operated in full auto and was classified as a machine gun, whereas the rifle was determined to have a binary trigger system, meaning that the rifle would fire a round with both the pull and release of the trigger.

33.   On February 1, 2022, at approximately 5:00 PM, the UC received a photograph from JAWANDA via Snapchat which depicted a Glock 26 style handgun with a multi-colored slide.  The photograph appeared to be a screenshot that JAWANDA took from another user's Snapchat account because the display name at the top left side corner of the photo listed the name "Bobbie Jo" (which is believed to be R.VANN); the photo is provided below.

/ / /

/ / /

/ / /

11



D. **_On February 17, 2022, the UC purchased approximately 2,500 counterfeit oxycodone blue "M30" pills containing fentanyl from JAWANDA._**

34. On February 17, 2022, the UC purchased approximately 2,500 counterfeit oxycodone blue "M30" pills for $5,000 from JAWANDA in Sacramento, CA, as further detailed below. This controlled purchase was negotiated via Snapchat communications between the UC and JAWANDA who used Snapchat account "money_bags530" (JAWANDA ACCOUNT-3) instead of JAWANDA ACCOUNT-1 (which by this time had been deactivated).

35. At approximately 1:21 PM, the UC arrived and parked in the Kentucky Fried Chicken (KFC) restaurant parking lot located at 2920 Del Paso Road, Sacramento, CA, which was in the vicinity of the prearranged meeting location with JAWANDA.

36. At approximately 2:14 PM, the UC placed an outgoing call to JAWANDA via Snapchat to JAWANDA ACCOUNT-3 and during this conversation (which was recorded by a recorder/transmitting device utilized by the UC) JAWANDA indicated that he (JAWANDA) needed to pick up the pills at his (JAWANDA's) residence.

37. At approximately 2:50 PM, the UC received an incoming call from JAWANDA via Snapchat from JAWANDA ACCOUNT-3 and during this conversation (which was recorded by the recorder/transmitting device), JAWANDA indicated that he (JAWANDA) was counting the pills at his (JAWANDA's) residence.

38.   At approximately 2:57 PM, surveillance observed JAWANDA arrive driving a grey
      Dodge Durango with paper plates (hereafter referred to as JAWANDA VEHICLE-2) and
      park on 31st Street near JAWANDA's known residence located at 3059 8th Avenue, Unit
      A, Sacramento, CA; it should be noted that 31st Street becomes 8th Avenue at the corner
      where JAWANDA's known residence is situated.  Shortly thereafter, surveillance
      observed JAWANDA walk up to the front door of the 3059 8th Avenue Unit A residence.

39.   At approximately 3:12 PM, surveillance observed JAWANDA exit the front door of the
      3059 8th Avenue Unit A residence and then depart driving JAWANDA VEHICLE-2.

40.   At approximately 3:30 PM, surveillance observed JAWANDA arrive at the KFC parking
      lot located at 2920 Del Paso Road, Sacramento, CA and park JAWANDA VEHICLE-2.
      Immediately thereafter, surveillance observed JAWANDA exit JAWANDA VEHICLE-2
      and get into the front passenger seat of the UC's vehicle with the UC.  JAWANDA then
      delivered approximately 2,500 suspected counterfeit oxycodone blue "M30" pills to the
      UC in exchange for $5,000 in official government funds.  The pills were contained in
      three (3) paper coffee cups, two with approximately 1,000 pills each, and the third cup
      with approximately 500 pills.  The pills were later submitted to a DEA laboratory for
      analysis, which determined the total quantity of pills to be approximately 2,560, with a
      net weight of approximately 278.8 grams, which contained fentanyl and acetaminophen.

41.   At approximately 3:35 PM, surveillance observed JAWANDA exit the UC's vehicle and
      get back into the driver's seat of JAWANDA VEHICLE-2.  Immediately thereafter,
      surveillance observed JAWANDA drive JAWANDA VEHICLE-2 into the drive-thru
      lane at the In-N-Out Burger restaurant located at 2900 Del Paso Road, Sacramento, CA
      (situated in the adjacent lot next to the KFC).  Shortly thereafter, surveillance observed
      JAWANDA depart the In-N-Out Burger lot driving JAWANDA VEHICLE-2.

42.   At approximately 4:04 PM, surveillance observed JAWANDA arrive and park
      JAWANDA VEHICLE-2 in the same location on 31st Street near JAWANDA's known
      residence located at 3059 8th Avenue, Unit A, Sacramento, CA, after driving directly
      home from In-N-Out Burger.  Immediately thereafter, surveillance observed JAWANDA
      exit the driver's seat of JAWANDA VEHICLE-2 and walk to the front door of the 3059
      8th Avenue Unit A residence.  Shortly thereafter, surveillance was terminated for that
      date.

43.   The next day, on February 18, 2022, at approximately 1:24 PM, surveillance observed
      JAWANDA VEHICLE-2 parked on the street near JAWANDA's known residence at
      3059 8th Avenue, Unit A, Sacramento, CA.  Immediately thereafter, surveillance
      obtained the Vehicle Identification Number (VIN) from JAWANDA VEHICLE-2, which

13

was 1C4SDJH99MC757148.  A subsequent law enforcement query revealed that JAWANDA VEHICLE-2 was a 2021 Dodge Durango that was assigned Oregon license plate number 136MYA, which was registered to Jerry Wayne Braswell, 4551 Coloma Drive SE, Salem, Oregon 97302.

44.   On March 2, 2022, at approximately 4:00 PM, surveillance observed JAWANDA VEHICLE-2 parked on the street near JAWANDA's 3059 8th Avenue Unit A residence. At this time, surveillance observed that JAWANDA VEHICLE-2 now displayed California license plate number 8YGP548.  A subsequent CA DMV check revealed that JAWANDA VEHICLE-2 was registered to Joseph Lee Edward Wright, 6024 Alberta Ave, Apt 33, Marysville, CA 95901 (CA DMV records also listed the correct VIN for JAWANDA VEHICLE-2).  Later on the same date, United States Magistrate Judge Jeremy D. Peterson of the Eastern District of California authorized a Tracking Warrant for JAWANDA VEHICLE-2, which was then installed the next morning.

**E.   _On March 23, 2022, the UC purchased a Smith & Wesson M&P AR-15 style semi-automatic rifle, a Glock 26 semi-automatic handgun, and a Draco AK-47 style semi-automatic pistol from JAWANDA._**

45.   On March 14, 2022, at approximately 8:52 AM, the UC initiated a Snapchat text message conversation with JAWANDA ACCOUNT-3.  During this conversation, the UC asked JAWANDA, "Is your stepmom still making ghosts? I need a few" ("stepmom" being in reference to R.VANN, and "ghosts" being in reference to PMFs).  JAWANDA responded, "Ye."   The UC then responded, "Tell her I said what's good.  I need some ghost gmans" ("gmans" being slang for Glock style pistols whether they are privately or commercially made).  JAWANDA responded, "how many" and "she only makes em with down payment rn;" the conversation ended after this message.

46.   On March 15, 2022, a Yuba County Sheriff's Deputy conducted a ruse contact (at the request of agents) with JAWANDA at a new residence located at 7642 Redhill Way, Browns Valley, CA, which authorized tracking data for JAWANDA VEHICLE-1 revealed was being utilized by JAWANDA.  During this ruse contact, JAWANDA confirmed that he (JAWANDA) had just moved into the residence.  The authorized tracking device installed on JAWANDA VEHICLE-2 had revealed that it was often parked at this new address during nighttime hours.[3]

---

[3] On March 2, 2022, a federal tracking warrant was authorized for JAWANDA VEHICLE-2, which was installed on March 3, 2022.  It should be noted that the face page of the warrant was missing complete dates for when the tracker was to be installed by, and for how long the tracker could be utilized for, which were 10 days and 45 days from the issue date of the warrant, respectively.  Therefore, the warrant should have notated that the tracker was to be installed by March 12, 2022, and that the last date to utilize the tracker was April 16, 2022, both of which dates were adhered to.  Additionally, in the body of the warrant's

47.  On March 23, 2022, another controlled purchase operation was conducted with JAWANDA during which the UC purchased a (1) Smith & Wesson M&P AR-15 style semi-automatic rifle, a (2) Glock 26 semi-automatic handgun, and a (3) Draco AK-47 style semi-automatic pistol, for a total of $5,700 in official government funds, in Marysville, CA.

48.  Prior to this transaction, authorized tracking data for JAWANDA VEHICLE-1 revealed that it had departed from the newly identified residence located at 7642 Redhill Way, Browns Valley, CA before traveling to Marysville, CA to sell the firearms to the UC.

49.  At approximately 5:09 PM, JAWANDA arrived in the area of Circle A gas station located at 1215 E. 22nd St, Marysville, CA in JAWANDA VEHICLE-1 to conduct the transaction with the UC.  During this deal, the UC and JAWANDA spoke about future firearms deals with the possibility of purchasing more "draco" style firearms. JAWANDA also told the UC that he (JAWANDA) was now living in the "Foothills" (the geographical area where the ruse contact by law enforcement occurred with JAWANDA at 7642 Redhill Way, Browns Valley, CA).  Additionally, JAWANDA told the UC that he (JAWANDA) was travelling to Los Angeles (CA) the next day (March 24, 2022) to purchase 60,000 "M30" fentanyl tablets and 16 kilograms of cocaine.

50.  On March 24, 2022, authorized tracking data for JAWANDA VEHICLE-1 revealed that it traveled to the Los Angeles, CA area and then later began traveling back towards the Sacramento area.

   **F.  _On March 25, 2022, JAWANDA was arrested pursuant to a traffic stop and seizures of approximately 30,000 counterfeit oxycodone blue "M30" pills containing fentanyl, approximately 1 kilogram of cocaine, and a firearm._**

51.  On March 25, 2022, at approximately 3:25 AM, a California Highway Patrol (CHP) officer observed a black GMC pickup truck, bearing CA license plate number C049J1, registered to Sukhmanpreet Singh JAWANDA, 1200 B Street, Apt 3, Yuba City, CA 95991 (JAWANDA VEHICLE-1), speeding and weaving between lanes on northbound Interstate-5 in Stockton, CA and subsequently conducted a traffic stop on the vehicle at S. Stanislaus St (exit off of Highway 4).  Pursuant to the traffic stop, CHP officers contacted the driver and sole occupant of the vehicle, identified as Sukhmanpreet Singh

---

face page there was a typo with respect to the license plate of JAWANDA VEHICLE-2, which was originally 136MYA, but later changed to 8YGP548.  The top of the warrant correctly notates 8YGP548 as the license plate for JAWANDA VEHICLE-2, but the body of the warrant's face page incorrectly lists the predecessor plate of 136MYA.

JAWANDA.  Due to JAWANDA's extreme nervousness, a CHP officer utilized a certified narcotic detection canine to conduct an exterior free air sniff of the black GMC truck, which resulted in a positive alert to the right front passenger's door.  JAWANDA then attempted to flee and resist arrest when apprehended by officers.  CHP officers subsequently searched the vehicle and discovered approximately 30,000 counterfeit oxycodone pills (which were separated into 30 separate packages divided equally into 3 heat sealed packages), approximately 1 kilogram of cocaine, a loaded Sig Sauer P365 semi-automatic handgun (S/N: NRA055351), a loaded 7.62x39 rifle magazine, and 3 Apple iPhone cellular telephones.  The drugs and magazine were located under the right rear seat inside of the vehicle, two of the cell phones were located in the driver's door, a third phone was located on the driver's seat, and the handgun was located underneath the driver's seat.  CHP officers *Mirandized* JAWANDA and he refused to answer any questions.  JAWANDA was arrested and transported to jail by CHP on state charges for possession and transportation of controlled substances for sale while armed and resisting arrest.  DEA responded to the CHP Stockton office and took custody of the pills, cocaine, firearm/magazine, and seized telephones.  The drugs were later submitted to a DEA laboratory for analysis, which determined the total quantity of pills to be approximately 29,444, with a net weight of approximately 3.3157 kilograms, which contained fentanyl, and the net weight of cocaine was determined to be approximately 1.006 kilograms.

52.  On March 29, 2022, Yuba-Sutter Narcotic & Gang Enforcement Task Force (NET-5) Detective Charanpreet Singh began to monitor JAWANDA's recorded inmate phone calls while JAWANDA was in custody at the San Joaquin County Jail.  While monitoring JAWANDA's jail calls, NET-5 Detective Singh noted the following conversations:

    i.    On March 26, 2022, at approximately 10:35 AM, JAWANDA placed an outgoing call from the jail to telephone number 530-821-1246 (subscribed to Lonnie VANN, 6625 Rancho Pico Way, Sacramento, CA 95828).  During this recorded call, JAWANDA spoke to L.VANN and Chharandeep Jawanda (JAWANDA's sister).  JAWANDA directed L.VANN to get "20 seals" ("seals" is a slang term for alprazolam when it is "sealed" in glass bottles in bulk quantity) from JAWANDA's residence in Sacramento.  JAWANDA and L.VANN discussed having R.VANN put her house up for collateral to bail JAWANDA out of jail.  JAWANDA and L.VANN discussed having L.VANN continue to supply narcotics to customers while JAWANDA was incarcerated.

    ii.    On March 26, 2022, at approximately 11:24 AM, JAWANDA placed an outgoing call from jail to telephone number 530-821-1246 (L.VANN).  During this recorded call, L.VANN stated, "Yo I got Bobbie Jo on the phone now" (in reference to R.VANN).  JAWANDA then greeted "Bobbie Jo" (R.VANN) and

asked how she was doing.  R.VANN responded that she was doing better than him and that JAWANDA needed to learn from his mistakes.  Immediately thereafter, R.VANN asked JAWANDA, "your Browns Valley, it is locked up? So, is everything safe?"  JAWANDA responded, "everything is safe there." R.VANN then responded, "ok."  L.VANN then got back on the call and stated that he was going to go up to Browns Valley and stay at the house for a few nights to watch it and make sure everything was safe.  L.VANN and JAWANDA then discussed JAWANDA signing a property release form so that his GMC truck (JAWANDA VEHICLE-1) could be released to L.VANN (since it had been towed after the traffic stop).  JAWANDA told L.VANN that the GMC could not be released to his family because the GMC is not in their name.  L.VANN then asked JAWANDA whose name the GMC was under and JAWANDA responded that is was in his (JAWANDA's) name.  R.VANN then responded in the background, "oh god."  R.VANN told JAWANDA that she was going to put money on JAWANDA's books so JAWANDA could continue making calls and then told JAWANDA that she (R.VANN) had to go.  JAWANDA responded, "thanks Bobbie."  JAWANDA and L.VANN then continued speaking and L. VANN asked if JAWANDA needed him (L.VANN) to contact "JoJo to get more."[4]  JAWANDA then instructed L.VANN to get hold of "JoJo."  JAWANDA then instructed L.VANN to contact his (JAWANDA's) sister and ask her all the questions.  L.VANN then asked JAWANDA what questions he (L.VANN) needed to ask JAWANDA's sister.  JAWANDA responded, "everything got changed around so I don't know where they're at, the (inaudible)."  L.VANN then asked if JAWANDA's sister went into JAWANDA's house, and JAWANDA responded, "yeah the (inaudible)."  L.VANN then stated that he (L.VANN) would talk to JAWANDA's sister in person and find out where everything was at.  Later in the call, L.VANN told JAWANDA that the only way he (L.VANN) could get into the Browns Valley house was through the window.  JAWANDA then told L.VANN to not go through the window and leave everything alone because he (L.VANN) was going to mess everything up.  JAWANDA then told L.VANN that no one was going to mess with the Browns Valley house.  JAWANDA then reminded L.VANN to get hold of JAWANDA's sister and get "1.5 off of Guzman."

 iii. On March 26, 2022, at approximately 5:04 PM, JAWANDA placed an outgoing call from the jail to telephone number 209-809-7793 (determined to be utilized by L.VANN based upon a voice comparison).  During this recorded call, L.VANN stated that JAWANDA's sister was "freaking out" about the Dodge Charger

---

[4] Agents have not identified "Jojo," but do not believe "Jojo" to be a reference to Robert "Bobbie Jo" Vann (R.VANN).

Hellcat (R.VANN VEHICLE-1). L.VANN stated that he had R.VANN get the Dodge Charger Hellcat (R.VANN VEHICLE-1) and take it to R.VANN's residence and park it in R.VANN's driveway. (NOTE: Authorized tracking data corroborated that R.VANN VEHICLE-1 traveled from Sacramento to 1628 Buena Vista Drive, Yuba City, CA, the known residence of R.VANN, arriving at 8:18 PM per authorized tracking data. Physical surveillance had previously observed R.VANN at this residence on multiple occasions, including on February 25, 2022 at approximately 8:39 AM, and on March 4, 2022 at approximately 8:30 AM.)

iv.     On March 27, 2022, at approximately 12:35 PM, JAWANDA placed an outgoing call from the jail to telephone number 209-809-7793 (L.VANN). During this recorded call, L.VANN informed JAWANDA that he (L.VANN) got "Jose Guzman's" number, and then L.VANN provided JAWANDA with telephone number 530-301-5483. JAWANDA then asked L.VANN if they had a license plate on the Dodge Charger Hellcat (R.VANN VEHICLE-1). L.VANN responded that he (L.VANN) put both license plates on the vehicle at R.VANN's house. L.VANN also stated that R.VANN took the wrapping off of the license plates because having wrap on the license plates was illegal and R.VANN did not want to get pulled over.

v.     On March 27, 2022, at approximately 4:31 PM, JAWANDA placed an outgoing call from jail to telephone number 209-809-7793 (L.VANN). During this recorded call, JAWANDA instructed L.VANN to meet with "JoJo" and to tell "JoJo" that he ("JoJo") needs "the shield and (inaudible) box and it has 15 in there and it has two fullys in there." L.VANN responded that he (L.VANN) would call "JoJo" immediately. JAWANDA then reiterated to L.VANN by stating, "you hear me, it's called Shield and Shield and it's a box that's got 15 in there and two fullys in there." Based on this statement, NET-5 Detective Singh believes that JAWANDA was referring to firearms and more specifically machine guns, since during the controlled firearm purchases by the UC, JAWANDA referred to machine guns as "fullys." It is NET-5 Detective Singh's belief that JAWANDA was directing L.VANN from jail to pick up firearms and was describing the firearms which L.VANN was to obtain in street slang commonly used during this investigation.

vi.     On March 28, 2022, at approximately 12:09 PM, JAWANDA placed an outgoing call from jail to telephone number 209-809-7793 (L.VANN). During this recorded call, L.VANN stated that he could not get hold of "JoJo" and that he (L.VANN) even went to his ("JoJo's") apartment and knocked on the door. JAWANDA then expressed disappointment in L.VANN. JAWANDA then

instructed L.VANN to tell R.VANN to not bring the car (referring to R.VANN VEHICLE-1) into Marysville (CA), and L.VANN responded that R.VANN was going to park the vehicle in a storage unit. L.VANN then told JAWANDA, "I got Edgar for the 2, and then I got somebody else today for 2 as well for you." L.VANN also stated that he (L.VANN) has his "boy Frankie." L.VANN then told JAWANDA, "I'm going to take out $100 off each one and put $900 (inaudible) of every sale and everything that I been doing, I been putting your money up for you." At this point in the call, JAWANDA interrupted L.VANN and told him (L.VANN) to stop talking about this on the phone. L.VANN responded, "my bad."

vii.   On March 29, 2022, at approximately 3:40 PM, JAWANDA placed an outgoing call from jail to telephone number 209-809-7793 (L.VANN). During this recorded call, JAWANDA told L.VANN that he (JAWANDA) was looking at 8–12 years in state prison. JAWANDA then told L.VANN that he (JAWANDA) believed that he (JAWANDA) was being followed by federal agents and that his (JAWANDA's) arrest was a "setup." JAWANDA then began speaking to R.VANN who was with L.VANN listening to the conversation. JAWANDA told R.VANN that they needed to learn from their mistakes. R.VANN then asked JAWANDA, "do we need to, you know, like clean out your storage? You know you gotta let us know what to do." JAWANDA then responded, "yeah yeah, ima let you know soon on that. Why don't you open up the car where you put your sunglasses?" L.VANN then interjected by stating, "storage key, I know I found it. We were putting the license plate back on." JAWANDA then continued telling L.VANN and R.VANN about how he (JAWANDA) believed that he (JAWANDA) was set up by the federal government, possibly the FBI.

53.   On April 1, 2022, at approximately 12:51 PM, authorized tracking data revealed that R.VANN VEHICLE-1 traveled from Farmers Insurance, 990 Klamath Lane, Yuba City, CA to AA Self Storage, 1788 Lassen Blvd, Yuba City, CA. Later that day, at approximately 3:27 PM, physical surveillance observed R.VANN VEHICLE-1 in the Walmart parking lot located at 1150 Harter Parkway, Yuba City, CA, and thereafter R.VANN VEHICLE-1 traveled to the nearby parking lot of Chase bank located at 1054 Harter Parkway, where surveillance observed R.VANN driving R.VANN VEHICLE-1.

54.   On April 4, 2022, I served a DEA Administrative Subpoena to AA Self Storage, 1788 Lassen Blvd, Yuba City, CA, requesting a list of individuals who rent storage units at the facility. In response, I received a tenant list of all individuals who were renting storage units at the facility, which displayed the name "Bobbie Jo Vann" twice, indicating that R.VANN was renting two units at the facility; however, the listing did not notate which

unit numbers.  I later requested additional information pursuant to the subpoena from AA Self Storage regarding the specific units rented by R.VANN and was provided with rental agreements for both units, which are detailed as follows:

  i.   On December 1, 2021, "Bobbie Jo Vann" (R.VANN) rented storage unit number "G92," which is a  5 ft x 5 ft unit, and listed "990 Klamath Ln Suite 19, Yuba City, CA 95993" as the customer address, which is R.VANN's employment address at Farmers Insurance.

  ii.  On March 31, 2022, "Bobbie Jo Vann" (R.VANN) rented storage unit number "1-2," which is a 12 ft x 20 ft unit, and again listed "990 Klamath Ln Suite 19, Yuba City, CA 95993" as the customer address, which is R.VANN's employment address at Farmers Insurance.  It should be noted that although the lease itself states that R.VANN was assigned unit "12," it was later confirmed by the facility that the correct number is "1-2."

55. On April 10, 2022, at approximately 12:13 PM, the UC observed that JAWANDA had posted a Snapchat photo of an AK Draco pistol with a drum magazine on JAWANDA ACCOUNT-3; the UC took a photo of the Snapchat post and noted that the post occurred approximately 11 minutes earlier.  The UC's photo of the Snapchat post is provided below and includes what appears to be JAWANDA's ankle monitor in view next to the firearm.

/ / /

/ / /

/ / /



56. On April 25, 2022, at approximately 9:00 AM, a Marysville Police Department officer responded to 916 Blue Street, Apt 8, Marysville, CA to conduct a ruse contact in order to identify the resident(s). After knocking on the door to Apt 8, the officer positively identified L.VANN as the individual who answered the door, based upon a comparison to L.VANN's CA DMV photograph. L.VANN stated to the officer that he (L.VANN) lived there with his (L.VANN's) girlfriend, Morgan Roberts.

57. On April 28, 2022, NET-5 Detective Singh learned from San Joaquin County Probation that JAWANDA's ankle monitor was installed on March 30, 2022, and that the company which manufactured JAWANDA's ankle monitor was named "Scram," which can be seen inscribed on the device in the photo above. According to San Joaquin County Probation, JAWANDA's ankle monitor data revealed that JAWANDA was at the 3059

8th Avenue, Unit A, Sacramento, CA residence on April 10, 2022 during the timeframe when JAWANDA posted the photo of the firearm above.  San Joaquin County Probation further indicated that JAWANDA provided the 1200 B Street, Apt 3, Yuba City, CA address as JAWANDA's place of residence, and that according to JAWANDA's ankle monitor data JAWANDA has spent the majority of time at the 1200 B Street, Apt 3, Yuba City, CA address and the 7642 Redhill Way, Browns Valley, CA address.

58.    Based upon the evidence detailed above, including controlled purchases, surveillance, and recorded jail calls, there is probable cause to believe that JAWANDA, R.VANN, and L.VANN are engaged in a conspiracy to traffic illegal firearms and controlled substances, including cocaine and fentanyl.

**AFFIANT'S EXPERIENCE REGARDING ITEMS TO BE SEIZED**

59.    Based on my training and experience and on consultations with other federal, state and local law enforcement personnel, I believe the following to be true:

60.    Persons involved in the distribution of controlled substances and/or firearms often maintain at their residences, outbuildings, secondary residences, businesses, rented storage units, and vehicles, quantities of controlled substances, as well as paraphernalia for manufacturing, use, packaging, and distribution of controlled substances.  Drug and firearm traffickers also maintain records relating to their trafficking activities in these same places.  These records include personal calendars, address/telephone books, and papers reflecting the names, addresses, pager, telephone, and fax numbers relating to their trafficking associates.  These records can be in written form.  Drug and firearm traffickers also keep stored messages and telephone numbers relating to their trafficking activities within electronic devices.  Further, drug and firearm traffickers often keep photographs and audio/video recordings depicting themselves and their associates, as well as their assets, controlled substances, and firearms.  They may also keep electronic equipment used for counter surveillance including scanners, cameras, monitors, and anti-bugging devices.

61.    Premises and vehicles used by individuals involved in drug and/or firearm dealing usually contain articles of personal property showing the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premise or property.

62.    From my training and experience, I know that individuals involved in drug and/or firearm trafficking frequently store their drugs, firearms, proceeds, and other contraband in rooms and areas of their residences that appear to belong to other occupants, including, for example, bedrooms belonging to children or other family members, in an effort to

conceal the evidence from law enforcement and to disguise their ownership and control of the contraband in the event that it is seized.  When executing a search warrant for a premises inhabited by multiple occupants, only some of whom are targets of the investigation, it is my practice, and the practice of other agents and officers who will be executing the proposed search warrant, to conduct a more cursory search of areas that appear to be under the control of non-targets of the investigation.  We focus our search on the areas under the control of the target(s), common areas, and areas where there is reason to believe, based on the totality of the circumstances and our training and experience, that the target(s) may be concealing contraband or other evidence described in Attachment B.  If there is no reason to believe an area of the target premises may contain such evidence or contraband, we conduct a protective sweep for officer safety reasons but do not search the area.

63.   Persons involved in the distribution of controlled substances and/or firearms often maintain records and ledgers listing their trafficking activities in these same places.  These records are kept to keep track of the ordering, purchasing, storage, distribution and transportation of controlled substances.  After drugs and/or firearms are sold, documentary records and ledgers often remain for long periods of time to memorialize past transactions, track the status of accounts receivable and accounts payable, and to record the names and telephone numbers of suppliers, customers and co-conspirators.  These records are often maintained not only on paper, but also as electronic or digital data in the form of computer hardware and software.

64.   Individuals involved in drug and/or firearm trafficking often use telephones, cellular telephones, electronic pagers, beepers, e-mail devices, text messaging, and voice mail and/or answering machines to conduct their business.  Individuals involved in drug and/or firearm trafficking must often rely on others to obtain drugs and to help obtain, market, distribute, and/or protect drugs.  To achieve some of the aforementioned objectives, I am aware that drug and/or firearm distributors will often, among other methods, have a courier transport drugs/firearms or drug/firearm proceeds or ship controlled substances/firearms/ proceeds through the mail or by common carrier.  Evidence related to the identities of these co-conspirators are often maintained in these locations.

65.   Individuals involved in drug and/or firearm trafficking often maintain large amounts of U.S. currency to maintain and finance their on-going drug business.  In addition, assets generated by their illicit business are typically kept on-hand by drug and/or firearm dealers to avoid detection by authorities and/or reporting requirements.  Individuals involved in drug and/or firearm trafficking often attempt to legitimize the source of these profits.  In order to do this, they attempt to secrete, transfer and conceal the money by,

among other way:  (a) Placing assets in names of nominees to avoid detection, while still maintaining control of the assets; (b) Laundering money through what appears to be a legitimate business or businesses; (c) Hiding money in their homes, safes, or safety deposit boxes; and (d) Using money to buy assets which are hard to trace by law enforcement.  Records of these transactions are often found in the aforementioned locations.

66.   Additionally, based on my training and experience and the training and experience of other investigators, I know persons involved in narcotic and/or firearm trafficking acquire personal and real property with their narcotic/firearm proceeds, and maintain evidence of financial transactions related to obtaining, transferring, secreting, or the spending of large sums of money made from drug and/or firearm trafficking activities.  These records include bank statements, passbooks, money drafts, checkbooks, tax returns, loan statements, escrow files, and wire transfer records.  Persons involved in drug trafficking will often convert the currency into cashier's checks, bearer bonds, precious metals, gold, diamonds, and other jewelry in an attempt to hide large amounts of currency, and that evidence of such will be located at the described locations.

67.   Individuals involved in drug and/or firearm dealing often take, or cause to be taken, photographs of themselves, their associates, their property, and/or their drugs, and usually maintain these photographs in the aforementioned locations.

68.   Individuals involved in drug trafficking often maintain weapons, firearms, and ammunition on their person, in their residences, and/or in their vehicles in order to protect themselves and guard their drugs and drug profits, and for enforcement purposes during drug transactions.  These weapons and firearms can be used, and often are used, as an instrumentality of the crime of drug possession and distribution.  Therefore, I am requesting permission to seize weapons, firearms, and ammunition that may be found at the premises or in the vehicles to be searched, as indicated in Attachment B.

69.   Individuals involved in drug and/or firearm trafficking often conceal evidence of their involvement in vehicles and outbuildings in order to prevent detection and seizure by law enforcement conducting lawful search warrants at residences.  Therefore, I am requesting permission to search all outbuildings located at each of the locations requested.

70.   Your affiant further believes that persons involved in the distribution of drugs and/or firearms will store items, further described in Attachment B, which is incorporated herein by reference, and that those items are used by drug traffickers in furtherance of their drug trafficking, or are obtained by drug traffickers as a result of their drug trafficking.

71. Based on my training, experience and conversations with other experienced agents, I am familiar with the methods and practices used by individuals and organizations involved in illicit activities that generate large amounts of income.  These methods include cash purchases, the purchasing of numerous monetary instruments with cash in amounts less than $10,000, the use of aliases and nominees, the use of businesses as "front" in an attempt to legitimize and conceal their activities and the use of "off-shore" banking in an attempt to break the paper trail.  These and other schemes are commonly referred to as "money laundering."

72. Individuals normally maintain records of their financial activity, such as receipts for expenditures by cash and check, bank records, and other financial documents, in their personal residences.  Furthermore, individuals engaged in an income-producing business keep records of the financial activities of the business for numerous reasons and often use accounts to complete financial statements and tax returns for their business and personal returns.

73. Persons engaged in drug and/or firearm trafficking and/or money laundering frequently retain records of their transactions within their residence, place of business, rented storage units, vehicles, or other places under their control.  These records may be in the form of written notes and correspondence, receipts, negotiated instruments, contracts, bank statements, and other records.  Records of this kind are also often stored on computer media.

74. Persons engaged in drug and/or firearm trafficking and/or money laundering often maintain such records or long period of time, particularly when they are involved in ongoing criminal conduct over a long period of time.  Based on my experience and review of *United States v. Greany*, 929 F.2d 523 (9th Cir. 1991), where there is evidence that the criminal activity is long-term ongoing criminal activity, it is more likely that evidence will be kept for long periods of time.  In addition, based on *United States v. Angulo-Lopez*, 791 F. 2d 1394, 1399 (9th Cir. 1986), I believe that evidence of a continuous pattern of drug and/or firearm dealing may be found where the drug and/or firearm dealers reside.

75. There are many reasons why criminal offenders maintain evidence for long periods of time.  The evidence may be innocuous at first glance (e.g., financial, credit card and banking documents, travel documents, receipts, documents reflecting purchases of assets, personal calendars, telephone and address directories, checkbooks, video recordings and photographs, utility records, ownership records, letters and notes, tax returns and financial records, escrow files, telephone and pager bills, keys to safe deposit boxes, packaging materials, computer hardware and software), but have significance and

relevance when considered in light of other evidence.  The criminal offender may no longer realize he/she still possesses the evidence.

76.   Individuals who amass proceeds from illegal activities routinely attempt to further that conduct and/or conceal the existence and source of their funds by engaging in financial transactions with domestic and foreign institutions, and others, through all manner of financial instruments, including cash, cashier's checks, money drafts, traveler's checks, wire transfers, etc.  Records of such instruments are routinely maintained at the individual's residence, place of business, or storage unit.

77.   The terms "evidence" and "documents" as used above include all of the items of evidence more fully described in Attachment B in whatever form and by whatever means such evidence or documents, their drafts or their modifications may have been created or stored.

## CONCLUSION AND REQUEST TO SEAL

78.   This Affidavit contains information regarding potential targets, which if unsealed may jeopardize the very information sought to be gained by these search warrants.  In light of the ongoing nature of the investigation, and the likelihood that notice to above-identified individuals may cause them to destroy evidence, flee from prosecution, and notify confederates, I request that this affidavit and the resulting search and arrest warrants be sealed on the Court's docketing system, with the exception of copies utilized by law enforcement officers participating in the investigation and a copy of the search warrants and an inventory of any items seized that will be left at the locations of the execution of the search warrants.

79.   I also hereby request that search warrants be issued for the locations described in Attachments A-1 through A-14 and to seize the items described in Attachment B.

/ / /

/ / /

/ / /

80.   I swear, under the penalty of perjury, that the foregoing information is true and correct to the best of my knowledge, information, and belief.


  /s/Matthew Clayton
Matthew Clayton
Special Agent
Drug Enforcement Administration


Sworn and Subscribed to me telephonically on May <u>10</u>, 2022.


DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE


Approved as to form:


  /s/ Alstyn Bennett
Alstyn Bennett
Assistant United States Attorney

# **Attachment A-14**

### **Red 2010 Nissan Altima BOBEEJO**

### **(R.VANN VEHICLE-2)**

<u>Vehicle to be Searched:</u> Red 2010 Nissan Altima, bearing personalized CA license plate number BOBEEJO, VIN 1N4AL2EP4AC173331, registered to Bobbie J. VANN, or Donald G. WIEDERSPAN, 6625 Rancho Pico Way, Sacramento, CA 95828.



# Attachment B
### Items to be Seized

Law enforcement is authorized to search and seize property that constitutes evidence, fruits, and instrumentalities of violations of the following federal statutes (the "Target Offenses"):

- 21 U.S.C. §§ 841(a) and 846 – Conspiracy to distribute and possess with intent to distribute controlled and/or counterfeit substances, including counterfeit opioid pills containing fentanyl, and cocaine.

- 21 U.S.C. § 841(a) – Distribution and possession with intent to distribute controlled and/or counterfeit substances, including counterfeit opioid pills containing fentanyl, and cocaine.

- 18 U.S.C. § 371 – Conspiracy to Unlawfully Deal in Firearms Without a License

- 18 U.S.C. § 922(a)(1)(A) – Unlawful Importing, Manufacturing, or Dealing in Firearms

As further described in the Affidavit, the specific evidence, fruits, and instrumentalities of the Target Offenses for which agents may search includes:

1. Controlled substances, including  fentanyl, counterfeit opioid pills, cocaine, or items used to distribute controlled substances; drug-trafficking paraphernalia, including scales, measuring devices, and weighing devices; narcotics diluting or cutting agents; narcotics packaging materials, including plastic, tin foil, cellophane, jars, plastic bags, and containers; and plastic surgical gloves;

2. United States and foreign currency linked to drug and/or firearm trafficking and/or the proceeds of drug and/or firearm trafficking, including the pre-recorded U.S. currency used to purchase counterfeit oxycodone pills and firearms during this investigation;

3. Narcotics/firearms or money ledgers, narcotics/firearms distribution or customer lists, narcotics/firearms supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics and/or firearms were purchased, possessed, transferred, distributed, sold or concealed;

4. Telephone paging devices, beepers, mobile phones, smart phones, car phones, answering machines and tapes, and other communication devices which could be used to participate in a conspiracy to distribute controlled and/or counterfeit substances and/or unlawful importing, manufacturing, or dealing in firearms;

5.  Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of narcotics or firearms;

6.  Personal telephone books, address books and other such address listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes connected to drug and/or firearm trafficking, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug and/or firearm trafficking activities;

7.  Financial instruments purchased with large amounts of currency derived from the sale of controlled substances and/or firearms, including traveler's checks, bonds, stock certificates, cashier's checks and certificates of deposit; money counting machines, money wrappers and bags used to carry controlled substances;

8.  Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds from the sale of controlled substances and/or firearms;

9.  Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to location;

10.  Handguns, shotguns, rifles, explosives, and other firearms/incendiary devices and ammunition that may be used to facilitate the distribution or possession of, with the intent to distribute controlled substances or discovered in the possession of a prohibited person;

11. Any tool or instrument used to manufacture, convert, or complete a firearm including drill presses, hand drills, drill bits, milling machines, Dremel tools or similar handheld power tools, detachable bits, burrs, grinders, sharpeners, cutters, cleaners, polishers, or sanders;

12. Any kits, components of kits, or tools used in conjunction with the same used to manufacture, convert, or complete a firearm including stencils, templates, cutouts, frames, guides, patterns, jigs, jig sets, or other custom made tools to control the location and/or motion of parts or other tolls, clamps, vises, or screws to hold or position the jig, parts lists, printed directions, guidelines, or instructions, and packaging materials used to contain the kit or kit components including boxes, cartons, bags, or packets whose appearance, markings, and/or mailing or shipping labels are reasonably identifiable as being used for the purposes of sending or storing the above described kits or kit components;

13. Any gun parts including upper receivers, barrels, springs and pins such as those used in association with bolt catches, buffers, disconnectors, hammers, magazine catches, safety selectors, and triggers, disconnectors, firing pins, hammers, bolt catches, buffers, safety plungers, extractors, forward assist plungers, ejection port covers, charging handles, slide cover, plates, recoil spring and guide rod assemblies, front and rear sites, triggers, trigger guards or housings, slide locks, magazine catches, pistol grips, handguards, handguard caps, flash hiders or suppressors, and buttstocks;

43

14.  Evidence of kit or firearms components purchase including shipping records, statements, bills, and/or invoices.  Any firearms, firearms pieces, firearms accessories, ammunition, gun-cleaning items or kits, holsters, ammunition belts, original box packaging materials, clips, magazines, cylinders, loading devices, targets, spent casings, expended pieces of lead/bullets, any photographs of firearms, or any paperwork showing the purchase, storage disposition, and/or dominion and control over any guns, any ammunition or any of the above items;

15.  Items related to manufacturing firearms parts or "swift links" to include but not limited to 3D printers, instruction manuals, individual parts for polymer 80 style pistols, indicia and items for the manufacturing of firearms;

16.  Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records; and

17.  Any digital devices (including cell phones and smart phones) or other electronic storage media and/or their components used as a means to commit the violations described above, including:

    a)      any digital device or other electronic storage media capable of being used to commit, further, or store evidence or fruits of the Target Offenses;

    b)      any digital devices or other electronic storage media used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, cameras, printers, plotters, encryption devices, and optical scanners;

    c)      any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

    d)      any documentation, operating logs and reference manuals regarding the operation of the digital device or other electronic storage media or software;

    e)      any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices, or data to be searched;

    f)      any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

    g)      any passwords, password files, seed words, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

18. For any digital device or other electronic storage media upon which electronically stored information that is called for by this warrant may be contained, or that may contain things otherwise called for by this warrant:

    a)    Any and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data in the memory of the digital device or other electronic storage media or on a server and associated with the digital device or other electronic storage media, including:

        1.    Incoming call history;

        2.    Outgoing call history;

        3.    Missed call history;

        4.    Outgoing text messages;

        5.    Incoming text messages;

        6.    Draft text messages;

        7.    Telephone book;

        8.    Emails;

        9.    Data screen or file identifying the telephone number associated with the mobile telephone searched;

        10.    Data screen, file, or writing containing serial numbers or other information to identify the electronic device searched;

        11.    Voicemail;

        12.    User-entered messages (such as to-do lists); and

        13.    Stored media such as photographs or video.

    b)    Any and all locations, addresses, GPS coordinates, names, time/date information, or other electronic data related to addresses and driving directions.

    c)    All information and records related to violations of 21 U.S.C. § 841(a) (drug trafficking),21 U.S.C. § 846 (conspiracy to traffic drugs), 18 U.S.C. § 922(a)(1)(A) (unlawful importing, manufacturing, or dealing in firearms), and/or 18 U.S.C. § 371 (conspiracy to unlawfully deal in firearms) including but not limited to:

1.      Data and information related to stored applications and/or websites used to communicate with associates and co-conspirators;

2.      Data, information, or documents related to the manufacture of controlled substances, including the acquisition, possession, and use of equipment, paraphernalia, chemicals, and materials used in the manufacturing process;

3.      lists of customers and related identifying information;

4.      types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

5.      any information related to sources of drugs or drug manufacturing materials and equipment (including names, addresses, phone numbers, email addresses, or any other identifying information);

6.      any information recording schedule or travel;

7.      all bank records, checks, credit card bills, account information, and other financial records;

8.      data, information, or documents related to the receipt of proceeds from controlled substances distribution and the transfer, investment, control, and disposition of those proceeds;

9.      records of Internet Protocol addresses used;

10.     records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

11.     any communications related to drug trafficking; and

12.     stored media such as photographs or video.

d)      evidence of who used, owned, or controlled the digital device or other electronic storage media at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

e)      evidence of software that would allow others to control the digital device or other electronic storage media, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

f)      evidence of the lack of such malicious software;

g)      evidence of the attachment to the digital device of other storage devices or similar containers for electronic evidence;

h)     evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the digital device or other electronic storage media;

i)     evidence of the times the digital device or other electronic storage media was used;

j)     passwords, encryption keys, seed words, and other access devices that may be necessary to access the digital device or other electronic storage media;

k)     documentation and manuals that may be necessary to access the digital device or other electronic storage media or to conduct a forensic examination of the digital device or other electronic storage media; and

l)     contextual information necessary to understand the evidence described in this attachment.

19.  Records and things evidencing the use of an Internet Protocol (IP) address to communicate with the internet, including:

a)     routers, modems, and network equipment used to connect computers to the internet;

b)     records of Internet Protocol addresses used; and

c)     records of internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any internet search engine, and records of user-typed web addresses.

THE SEIZURE OF DIGITAL DEVICES OR OTHER ELECTRONIC STORAGE MEDIA AND/OR THEIR COMPONENTS AS SET FORTH HEREIN IS SPECIFICALLY AUTHORIZED BY THIS SEARCH WARRANT, NOT ONLY TO THE EXTENT THAT SUCH DIGITAL DEVICES OR OTHER ELECTRONIC STORAGE MEDIA CONSTITUTE INSTRUMENTALITIES OF THE CRIMINAL ACTIVITY DESCRIBED ABOVE, BUT ALSO FOR THE PURPOSE OF CONDUCTING OFF-SITE EXAMINATIONS OF THEIR CONTENTS FOR EVIDENCE, INSTRUMENTALITIES, OR FRUITS OF THE AFOREMENTIONED CRIME.

AO 93  (Rev. 11/13) Search and Seizure Warrant

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

| | |
|---|---|
| In the Matter of the Search of<br><br>Red 2010 Nissan Altima, bearing personalized CA license<br>plate number BOBEEJO, VIN 1N4AL2EP4AC173331 | )<br>)<br>)<br>)<br>)<br>) |

Case No.  2:22-sw-0330 DB

**SEALED**

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search
of the following person or property located in the _____Eastern_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:

**SEE ATTACHMENT A-14, attached hereto and incorporated by reference.**

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property
described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

**SEE ATTACHMENT B, attached hereto and incorporated by reference.**

**YOU ARE COMMANDED** to execute this warrant on or before _____May 23, 2022_____ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.    ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the
person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the
property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory
as required by law and promptly return this warrant and inventory to: any authorized U.S. Magistrate Judge in the Eastern
District of California.

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C.
§ 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose
property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*  ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:     May 10, 2022 @ 12:11 p.m.

City and state:      Sacramento, California

DEBORAH BARNES
UNITED STATES MAGISTRATE JUDGE

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2) (modified)

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name of any person(s) seized:

| **Certification** |
|---|

I swear that this inventory is a true and detailed account of the person or property taken by me on the warrant.

_____

Subscribed, sworn to, and returned before me this date.

_____            _____
Signature of Judge                                                                Date

# **Attachment A-14**

### **Red 2010 Nissan Altima BOBEEJO**

### **(R.VANN VEHICLE-2)**

<u>Vehicle to be Searched:</u> Red 2010 Nissan Altima, bearing personalized CA license plate number BOBEEJO, VIN 1N4AL2EP4AC173331, registered to Bobbie J. VANN, or Donald G. WIEDERSPAN, 6625 Rancho Pico Way, Sacramento, CA 95828.



# Attachment B

## Items to be Seized

Law enforcement is authorized to search and seize property that constitutes evidence, fruits, and instrumentalities of violations of the following federal statutes (the "Target Offenses"):

- 21 U.S.C. §§ 841(a) and 846 – Conspiracy to distribute and possess with intent to distribute controlled and/or counterfeit substances, including counterfeit opioid pills containing fentanyl, and cocaine.

- 21 U.S.C. § 841(a) – Distribution and possession with intent to distribute controlled and/or counterfeit substances, including counterfeit opioid pills containing fentanyl, and cocaine.

- 18 U.S.C. § 371 – Conspiracy to Unlawfully Deal in Firearms Without a License

- 18 U.S.C. § 922(a)(1)(A) – Unlawful Importing, Manufacturing, or Dealing in Firearms

As further described in the Affidavit, the specific evidence, fruits, and instrumentalities of the Target Offenses for which agents may search includes:

1. Controlled substances, including  fentanyl, counterfeit opioid pills, cocaine, or items used to distribute controlled substances; drug-trafficking paraphernalia, including scales, measuring devices, and weighing devices; narcotics diluting or cutting agents; narcotics packaging materials, including plastic, tin foil, cellophane, jars, plastic bags, and containers; and plastic surgical gloves;

2. United States and foreign currency linked to drug and/or firearm trafficking and/or the proceeds of drug and/or firearm trafficking, including the pre-recorded U.S. currency used to purchase counterfeit oxycodone pills and firearms during this investigation;

3. Narcotics/firearms or money ledgers, narcotics/firearms distribution or customer lists, narcotics/firearms supplier lists, correspondence, notations, logs, receipts, journals, books, pay and owe sheets, records and other documents noting the price, quantity, date and/or times when narcotics and/or firearms were purchased, possessed, transferred, distributed, sold or concealed;

4. Telephone paging devices, beepers, mobile phones, smart phones, car phones, answering machines and tapes, and other communication devices which could be used to participate in a conspiracy to distribute controlled and/or counterfeit substances and/or unlawful importing, manufacturing, or dealing in firearms;

5.  Bank account records, wire transfer records, bank statements, safety deposit keys and records, money wrappers, money containers, income tax returns, evidence of financial transfer, or movement of money generated from the sale of narcotics or firearms;

6.  Personal telephone books, address books and other such address listings, letters, cables, telegrams, telephone bills, photographs, audio and video tapes connected to drug and/or firearm trafficking, personal notes and other items reflecting names, addresses, telephone numbers, communications, and illegal activities of associates in drug and/or firearm trafficking activities;

7.  Financial instruments purchased with large amounts of currency derived from the sale of controlled substances and/or firearms, including traveler's checks, bonds, stock certificates, cashier's checks and certificates of deposit; money counting machines, money wrappers and bags used to carry controlled substances;

8.  Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds from the sale of controlled substances and/or firearms;

9.  Records, items, and documents reflecting travel, including airline tickets, credit card receipts, travel vouchers, hotel and restaurant receipts, canceled checks, maps and written directions to location;

10.  Handguns, shotguns, rifles, explosives, and other firearms/incendiary devices and ammunition that may be used to facilitate the distribution or possession of, with the intent to distribute controlled substances or discovered in the possession of a prohibited person;

11. Any tool or instrument used to manufacture, convert, or complete a firearm including drill presses, hand drills, drill bits, milling machines, Dremel tools or similar handheld power tools, detachable bits, burrs, grinders, sharpeners, cutters, cleaners, polishers, or sanders;

12. Any kits, components of kits, or tools used in conjunction with the same used to manufacture, convert, or complete a firearm including stencils, templates, cutouts, frames, guides, patterns, jigs, jig sets, or other custom made tools to control the location and/or motion of parts or other tolls, clamps, vises, or screws to hold or position the jig, parts lists, printed directions, guidelines, or instructions, and packaging materials used to contain the kit or kit components including boxes, cartons, bags, or packets whose appearance, markings, and/or mailing or shipping labels are reasonably identifiable as being used for the purposes of sending or storing the above described kits or kit components;

13. Any gun parts including upper receivers, barrels, springs and pins such as those used in association with bolt catches, buffers, disconnectors, hammers, magazine catches, safety selectors, and triggers, disconnectors, firing pins, hammers, bolt catches, buffers, safety plungers, extractors, forward assist plungers, ejection port covers, charging handles, slide cover, plates, recoil spring and guide rod assemblies, front and rear sites, triggers, trigger guards or housings, slide locks, magazine catches, pistol grips, handguards, handguard caps, flash hiders or suppressors, and buttstocks;

43

14.  Evidence of kit or firearms components purchase including shipping records, statements, bills, and/or invoices.  Any firearms, firearms pieces, firearms accessories, ammunition, gun-cleaning items or kits, holsters, ammunition belts, original box packaging materials, clips, magazines, cylinders, loading devices, targets, spent casings, expended pieces of lead/bullets, any photographs of firearms, or any paperwork showing the purchase, storage disposition, and/or dominion and control over any guns, any ammunition or any of the above items;

15.  Items related to manufacturing firearms parts or "swift links" to include but not limited to 3D printers, instruction manuals, individual parts for polymer 80 style pistols, indicia and items for the manufacturing of firearms;

16.  Indicia of occupancy, residency, control or ownership of the premises and things described in this warrant, including utility bills, telephone bills, loan payment receipts, rent documents, canceled envelopes and keys, photographs, and bank records; and

17.  Any digital devices (including cell phones and smart phones) or other electronic storage media and/or their components used as a means to commit the violations described above, including:

     a)      any digital device or other electronic storage media capable of being used to commit, further, or store evidence or fruits of the Target Offenses;

     b)      any digital devices or other electronic storage media used to facilitate the transmission, creation, display, encoding or storage of data, including word processing equipment, modems, docking stations, monitors, cameras, printers, plotters, encryption devices, and optical scanners;

     c)      any magnetic, electronic or optical storage device capable of storing data, such as floppy disks, hard disks, tapes, CD-ROMs, CD-R, CD-RWs, DVDs, optical disks, printer or memory buffers, smart cards, PC cards, memory calculators, electronic dialers, electronic notebooks, and personal digital assistants;

     d)      any documentation, operating logs and reference manuals regarding the operation of the digital device or other electronic storage media or software;

     e)      any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices, or data to be searched;

     f)      any physical keys, encryption devices, dongles and similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

     g)      any passwords, password files, seed words, test keys, encryption codes or other information necessary to access the computer equipment, storage devices or data.

44

18. For any digital device or other electronic storage media upon which electronically stored information that is called for by this warrant may be contained, or that may contain things otherwise called for by this warrant:

    a)    Any and all names, words, telephone numbers, email addresses, time/date information, messages or other electronic data in the memory of the digital device or other electronic storage media or on a server and associated with the digital device or other electronic storage media, including:

        1.    Incoming call history;

        2.    Outgoing call history;

        3.    Missed call history;

        4.    Outgoing text messages;

        5.    Incoming text messages;

        6.    Draft text messages;

        7.    Telephone book;

        8.    Emails;

        9.    Data screen or file identifying the telephone number associated with the mobile telephone searched;

        10.    Data screen, file, or writing containing serial numbers or other information to identify the electronic device searched;

        11.    Voicemail;

        12.    User-entered messages (such as to-do lists); and

        13.    Stored media such as photographs or video.

    b)    Any and all locations, addresses, GPS coordinates, names, time/date information, or other electronic data related to addresses and driving directions.

    c)    All information and records related to violations of 21 U.S.C. § 841(a) (drug trafficking),21 U.S.C. § 846 (conspiracy to traffic drugs), 18 U.S.C. § 922(a)(1)(A) (unlawful importing, manufacturing, or dealing in firearms), and/or 18 U.S.C. § 371 (conspiracy to unlawfully deal in firearms) including but not limited to:

1.      Data and information related to stored applications and/or websites used to communicate with associates and co-conspirators;

2.      Data, information, or documents related to the manufacture of controlled substances, including the acquisition, possession, and use of equipment, paraphernalia, chemicals, and materials used in the manufacturing process;

3.      lists of customers and related identifying information;

4.      types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

5.      any information related to sources of drugs or drug manufacturing materials and equipment (including names, addresses, phone numbers, email addresses, or any other identifying information);

6.      any information recording schedule or travel;

7.      all bank records, checks, credit card bills, account information, and other financial records;

8.      data, information, or documents related to the receipt of proceeds from controlled substances distribution and the transfer, investment, control, and disposition of those proceeds;

9.      records of Internet Protocol addresses used;

10.     records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses;

11.     any communications related to drug trafficking; and

12.     stored media such as photographs or video.

d)      evidence of who used, owned, or controlled the digital device or other electronic storage media at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

e)      evidence of software that would allow others to control the digital device or other electronic storage media, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

f)      evidence of the lack of such malicious software;

g)      evidence of the attachment to the digital device of other storage devices or similar containers for electronic evidence;

46

h)       evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the digital device or other electronic storage media;

i)       evidence of the times the digital device or other electronic storage media was used;

j)       passwords, encryption keys, seed words, and other access devices that may be necessary to access the digital device or other electronic storage media;

k)       documentation and manuals that may be necessary to access the digital device or other electronic storage media or to conduct a forensic examination of the digital device or other electronic storage media; and

l)       contextual information necessary to understand the evidence described in this attachment.

19.  Records and things evidencing the use of an Internet Protocol (IP) address to communicate with the internet, including:

a)       routers, modems, and network equipment used to connect computers to the internet;

b)       records of Internet Protocol addresses used; and

c)       records of internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any internet search engine, and records of user-typed web addresses.

THE SEIZURE OF DIGITAL DEVICES OR OTHER ELECTRONIC STORAGE MEDIA AND/OR THEIR COMPONENTS AS SET FORTH HEREIN IS SPECIFICALLY AUTHORIZED BY THIS SEARCH WARRANT, NOT ONLY TO THE EXTENT THAT SUCH DIGITAL DEVICES OR OTHER ELECTRONIC STORAGE MEDIA CONSTITUTE INSTRUMENTALITIES OF THE CRIMINAL ACTIVITY DESCRIBED ABOVE, BUT ALSO FOR THE PURPOSE OF CONDUCTING OFF-SITE EXAMINATIONS OF THEIR CONTENTS FOR EVIDENCE, INSTRUMENTALITIES, OR FRUITS OF THE AFOREMENTIONED CRIME.